Good morning. I'm Paul Eaglin from Fairbanks. I'm here to represent Adrienne Reid-Goss. Thank you for hearing my client's appeal. I'd like to concentrate my attention on the specific focus of the difference in the briefs, which is at the Step 2 level of the familiar five-step sequential evaluation. And the reason that I want to concentrate on Step 2 is because what I'd like to do is to build towards talking about the residual functional capacity and then also the difference between the parties on the equivalence argument that you noticed in our briefs. That is, whether she does or does not have impairments that equal a listing. In this case, I think our attention probably will be concentrated on listing 1.03 as the primary focus that you saw in our briefs. The reason that I'd like to concentrate on Step 2 is our position is that you should notice from the administrative law judge's decision that there seemed to be a lack of attention to her significant knee impairments. These were not acknowledged at Step 2, the severity threshold level, as severe impairments. There's just one, degenerative joint disease. Now, of course, there is the argument that if the impairment is degenerative joint disease, then perhaps that comprehends all joints. Our position is that that ought not to be sufficient because we have a number of cases that discuss the articulation requirement with respect to the extent to which a decision maker, such as an administrative law judge, ought to explain in a bit of detail why he or she finds that an impairment is severe or significant for vocational purposes. Here, the knees are critical. She had no high school education. She had a career as a kitchen helper. She's down on her knees scrubbing floors, walking around, serving dishes and moving about. The knees are absolutely critical. In terms of the listings, they're critical. After all, listing 1.03 and 1.02 speak about weight-bearing joints. Counsel, let me just ask, didn't your client fail to claim that her knee injury was equivalent to listing 1.02? Did she make any claim about that? At the administrative level, I believe that we were making that argument. In fact, her argument was that she satisfied at Step 3 that she satisfied the listing. And so at Step 3, the discussion was whether an impairment meets or equals a listing. And our argument, I'm pretty sure my argument all through this case from the administrative level, has been that she satisfied that. Wasn't she supposed to have sort of a gross deformity at that stage under the terms of the listing? And wasn't she able to ambulate effectively? There's a difference between the parties on that, Judge Nelson. The reason is that our position is that she does not ambulate effectively. The commissioner's position is that she does. Our position would be that, as reflected by her need for using canes, that's one. Second, her knock-knee arrangement that became more and more severe in its vocational impact and in her ability to ambulate as her knees got worse and worse. And, of course, the primary, the main need that was the worst, so to speak, was the right knee. But what was happening, according to the medical records, is that the left knee also was deteriorating because of the need to compensate, overcompensate, because of the poor condition of the right knee. The right knee had been operated on by Dr. Cobb then and had received attention through the workers' compensation claim. So she has a knock-knee arrangement. She has a career in the kitchen. She has both knees are bad. She has degenerative joint disease throughout her body. So to get back to focus on what you were asking, if you should find that she does not satisfy the gross deformity, then our argument would be on an equivalent basis that her taking into account all of her impairments, that it would be equivalent to the gross deformity requirement of 103 and 102. If you should find yourself thinking along those lines, Judge Nelson. All right. Thank you, Counsel. Okay. Sure. And so the reason to concentrate on Step 2 then is that it becomes significant later at the residual functional capacity analysis, which is an unnumbered step after Step 3 prior to Step 4. The decision, the judge, the administrative bar judge's decision does not take into account the knee. It ought to articulate as part of the residual functional analysis, residual functional capacity analysis, that she has significant, vocationally significant impairment at the knees. It did not do that. In fact, you'll notice that at the RFC analysis there, the judge, the administrative bar judge, even recites that she should have no, should be expected to have no problem with pushing and pulling. Well, the knees are critical to pushing and pulling and that type of activity in a work environment. So, and then in the, to get back to the argument with respect to equivalence, whether that is, whether taken as a whole her impairments are equal, a listing level impairment, our position would be that if you were to take into account the entire body of medical evidence that you see here in the record, summarized by us, summarized by the commissioner in his brief, then you should find either that her impairments taken as a whole are equivalent to 103 or 102, or if you should find yourself in the position of the court, the Ninth Circuit in Marsha versus Sullivan, which made an important holding with respect to the equivalence doctrine, you might find instead that if you are not comfortable with saying that she equals a listing, then you might consider remanding this case so that the administration can consider this on remand and speak to the knees specifically. It did not do that here. It did not find that the knees were a severe impairment. It did not take it into account in the individual functional capacity analysis. Just so I understand where you're going ultimately with the argument, if you look at finding six of the ALJ, is it ER 107? You're talking about her past work having been in the kitchen where she was on her knees and the like. Between 6 and 12, the combination on sedentary analysis has her doing what looks like is limited about, or certainly nothing that would involve getting down on her knees. The question is whether she can sit, stand, lift at some point. So what would be the effect of our agreeing with you? What would be knocked out, say, under number six that she wouldn't be able to do? Under number six then, the last part I just spoke to, which is that it says that she has no limitations with regard to pushing or pulling, using her upper and lower extremities. Well, that's questionable in light of the fact that the knees obviously are lower extremities, and it's well documented how impaired her knees are. Standing and walking up to two hours in an eight-hour workday, sitting up to six hours. The knees are critical to all of those activities, sitting, walking, standing. But what we don't have, because the ALJ did not take account of the knees and speak to it in the way that he should have, then what we don't have is an analysis on the part of the ALJ as to just why the ALJ would find that she can do those things. So in answer to your question, Judge Fisher, I would say that two would be out, three would be out, because we don't have a sufficient basis here. The ALJ did not sufficiently discuss that. With respect to number one, there's evidence in the record in which she testified that she had a skillet that she says weighed eight pounds, one of her own personal skillets weighed eight pounds, and she says she cannot handle that anymore in her own kitchen. And that was part of the testimony. Unfortunately, I can't get back to that in this instance. No, you've answered my question. I appreciate it. Thank you. Can I reserve my three minutes? You may. Thank you. Thank you. May it please the Court, Richard Morris on behalf of Michael Astor, Commissioner of Social Security. Extreme limitation of ability to walk, extreme loss of function of both upper extremities, those are the requirements for functional loss of the musculoskeletal impairments and listings 1.0 and 1.2, 1.3. Those limitations are difficult to meet. I'd like to talk primarily today about the issue of listings. I'd like to discuss how do you meet a listing, and these in particular, the equivalence argument, and I'd like to talk about case law and how it has evolved with some degree. Why don't you focus on the equivalency at least to make sure on that list you do at least hit that, because that does seem to be one of the major issues here. Certainly. I would also like to talk about the RFC issue that has recently come up. Regarding meeting or equaling a listing, a listing is primarily a medical issue. We look at all evidence of the case, and they generally have two sections. There is a diagnosis of effect, and with 1.02, for instance, a major dysfunction of the joint is the diagnosis, and then it goes into explaining how that is characterized. And then there's a part two. In this particular listing, there's the word with. That means there has to be either an inability to effectively ambulate or the inability to perform finding gross movements. That would be true for equivalence, too. You need to make sure that there is a diagnosis that meets the medical findings, equals the medical findings, but also has the effect of having the functional limitations. Let me just ask this question that bothered me about this case. Didn't the administrative law judge fail to develop the record at step two and consider ailments in combination when he did appear to me to ignore the evidence of degenerative disc disease? Degenerative disc disease, meaning the back? Beg your pardon? Do you mean the back, Judge Nelson? Well, the evidence of the degenerative disc disease that she had, it appeared to me, and maybe you can point out to me, where he considered the severity of this ailment at step two. The ALG did not specifically address degenerative disc disease and the back. We would argue two things, that there is, in fact, no medically diagnosed signs and symptoms of degenerative disc disease. It is mentioned briefly in the medical records, but there are no specific findings. There are no x-rays. There are no tests. There is no finding by a physician that there is such a condition that results in functional limitations. The second part of the argument would be, even if there were an issue of back pain, and I believe the ALG did consider her pain complaints because he made an analysis of her credibility in that regard, we would also argue that the back pain complaints are taken into account in the residual functional capacity of a sedentary job, which requires sitting six hours a day, lifting less than 10 pounds. So if there were any back pain resulting from a severe or non-severe impairment, it's accounted for in a sedentary type job. Thank you. What are you saying? It's taken into account at a later step in the analysis? Yes, in the RFC. An RFC of sedentary work would account for plaintiff's complaints of back pain. What are you saying? So it's implicitly considered in arriving at the RFC, even though there's no discussion of it in the ALG's decision? Yes. Our first argument is there is no medically established condition, and we cite the Buchwald case for that. Secondly, even if the pain is considered of the results, there are no functional limitations shown other than that it's covered by the RFC. The issue of equivalence, 20 CFR 404.1526 covers that. The terminology used is equal medical significance. If you go to Section 1.00B2, it talks about how loss of function in these listings is found. Functional loss must result in an inability to perform fine gross motor movements or an inability to ambulate. I would like to point specifically to the state agency reviewing physician, Dr. Gupta, who did consider equivalency. His report is specifically at 291 to 300, and on page 300, I believe, he did state that he considered whether or not listing 1.02 and that were equal. In that regard, the physician is an expert in Social Security law and disability, and he noted that there was no equivalence. He also pointed out that gross deformity was not present. He also pointed out that the stiffness was not present in order to meet the diagnostic statement. Regarding the case law in this, the Marcia case came out by 9th Circuit April of 1990. The holding there was that an ALJ must adequately explain its evaluation of alternative tests, quote, unquote, alternative tests, and the combined effects. In that case, which I think is distinguishable, the claimant presented evidence of an alternative test that would allow her to meet the listing. That case dealt with liver impairments, and there was an alternative test to diagnosing liver impairments that was presented to the ALJ. In this case, there was, in fact, no theory of a diagnostic alternative or an equivalence that was made to the ALJ. That is being made by Ms. Reed-Coss on grace that was not before the ALJ. Subsequent to Marcia was the Gonzales case, which was only six months later. The holding there was that it was not necessary to state why a claimant failed to satisfy different sections of the listings. The ALJ's evaluation of the evidence is adequate for those purposes. Moving forward, Louis B. Ethel. Can I come back to Gupta? Where is it on the knees where he says it's not a—you're saying because it does not meet or equal listing? Is that the equivalency finding? Yes, on page 299—I'm sorry, 300. 300. Oh, but that doesn't address the equivalency. Well, it does. DJD, both knees disappear, but does not meet or equal. But he says because there's no gross anatomical deformity and no stiffness as flexion is 115, but RFC is given. What is one derived from that? I mean— Those are the requirements in the meeting part. But that's for a listing. Yeah, right. Okay, so I mean if—I'm not quite—I'm a little confused from just this because it's quite summary. We don't have the ALJ addressing this, do we, in the equivalency finding? Where does the ALJ translate what Gupta says into the ALJ's findings? He does not specifically address equivalency. He addresses listing. Right, and the problem I'm having is you look at Gupta, and he's acknowledging that there's severe pain, that she's got a bad knee and so on and so forth. She didn't show up with a cane, and she takes medication. But I don't see anything in the ALJ that helps me as a lay judge trying to figure out whether the ALJ just said, well, does not meet or equal, that that's the end of it. So Gupta is dispositive. That's a little difficult for me trying to understand what I'm reviewing then. Standing before you today, I would say I wish the ALJ had done a more distinct job. I think the case law, Marcia Gonzales Lewis, which cites Marcia, is that there is an implicitness that if you, in fact, don't have a specific theory presented to the ALJ, it's covered. Okay, so is your argument that it wasn't presented to focus the ALJ, that there was equivalency? What is the argument to it? The argument is that the ALJ made a finding that does not meet or equal. Whether or not the ALJ needs to go into a lot more detailed explanation is driven by misalignment cases. And the answer is what you just said, that because no theory on equivalence alternate tests specifically provided at the hearing level or earlier, there was no need to go into more detail. It is an implicit finding. So it's the burden of the claimant to establish that her impairment equals an impairment in the regulation. Without a doubt, it is the claimant's fault. And your claim is that that was not done in this case. That is correct. All right. Okay, thank you. Thank you. If I could just return very briefly to Marcia. If you could address the last point. Gupta says does not meet or equal. He addresses in some detail the knee problem. The argument is, well, it wasn't presented to the ALJ that there was some specific equivalency issue that the ALJ needed to address. So can you help us out on that? Yes, but at the hearing level with the ALJ, the argument made to the ALJ was that she met or equal. Well, actually, the argument she was making was that she met the listing. So he finds that she didn't. So now you're all backup arguments. Well, if we didn't meet the exact criteria, it was certainly equivalent to it. Yes, that would be the backup argument because that is part of step three. Step three is meets or equals. And you'll see in the ALJ's decision that. But at step five, it was discussed in any event in terms of her ability to perform sedentary work. So what – I don't know if you were counsel, but was there the opportunity at step five of the analysis when moved beyond step three – I don't know how these proceedings work, whether you divide it up in the hearing. I was counsel. And at step five, what happened, as you'll see in the transcript at the very end of the administrative record there, it was – the best way I think that it would have been comprehended would have been in the hypothetical that the administrative law judge posed to the vocational expert. That's where he or she, and in this case it's he, tries to capsulize. Yes, I understand that. Okay. So what he posed was what you'll see there in the record, and then the vocational expert said that she couldn't do her past work, and then he modified that and suggested the three jobs that you see in the record here. I then asked to take account of her need to be absent from work because the record – I felt that the record medically established that there would be a number of absences from work after all. But did you focus him on the question that you're raising before us, which is the knees are critical to everything, therefore she couldn't sit, stand, walk, lift, and so on? It was throughout the hearing. I mean, I would say that – perhaps you'll come to a different conclusion when you look at the transcript, but to my impression – Because that was the focus – Our hearing was – That's what you were focused on. Okay. We were focusing entirely on the knees. All right. Because they were so critical and because that was the strongest element in the medical records here was the attention that she had for her knees. She had her right knee operated on in her workers' compensation claim. Even the insurance company doctors had commented about that in ways that were, for the most part, favorable to her in terms of establishing a disability. Ultimately, she was not successful. I don't know what you're arguing about. Did you argue for the ALJ that she, as far as the knees are concerned, that she met the listing or that it was an equivalent condition? Which? At step three, the argument that I typically make and what I would have made here is that she met the listing, which comprehends also equaling because that analysis is required when making the argument of meeting. The ALJ is also supposed to consider whether the person equals, whether the impairments equal the listing in terms of their vocational impact. What about the argument that Mr. Morris made that, well, even if that earlier step, the ALJ's discussion of the equivalency factor wasn't as elaborate maybe as it should have been, it's, in effect, harmless because he took that into account at the later step when he was discussing the RFC. Right, Judge Kishima, with respect to that, I would say that, one, I disagree, and the reason I disagree is that we don't, first of all, the administrative law judges' consideration of the three jobs that you see there at the sedentary level do not take account of the needs and the impact of the needs in walking, standing, the sitting, even with respect to sitting that is required in sedentary jobs for the time period that is discussed there, two hours walking, standing, six hours sitting, but there was not an adequate articulation by the ALJ of the vocational significance of her knee impairments. I guess the real question for me is, you made the argument that it made the listing, but did you make the argument that if it doesn't meet the listing, it's equivalent before the ALJ? Before the ALJ, the argument was that she met the listing. That's what I heard you say. Did you make an alternative argument that if it doesn't meet the listing, then her pain and suffering is equivalent to what would make the listing? I would say that I did. The argument you'll see in the transcript, but I would say that I did in terms of following up upon the ALJ's hypothetical to add to it the element that I felt that he had not taken account of. In that particular instance, it was pain. But taken together, I would say that, yes, we did make the argument of equivalency. You'll see and you'll be able to judge for yourself whether it was explicit or not. Okay. I think we have the point. Thank you very much, counsel. Thank you both. All right. The case argued is submitted, and we'll proceed to the next case on calendar, which is Brooke M. v. Alaska Department of Education and Early Development.
judges: Nelson, Tashima, Fisher